# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHARLES TONY NELSON,

      Petitioner,

v.                                                  Case No. 3:17-cv-812-J-32MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

## I.     **Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is challenging a state court (Duval County, Florida) judgment of conviction for unarmed burglary, for which he is currently serving a twenty-five-year term of incarceration as a Habitual Felony Offender with a fifteen-year minimum mandatory as a Prison Releasee Reoffender. Id. Respondents have responded. See Doc. 19; Response.[1] Petitioner filed a Reply. See Doc. 25.

---

[1] Attached to the Response are numerous exhibits. See Doc. 19-1. The Court cites to the exhibits as "Resp. Ex."

This case is ripe for review.

## II.   **Governing Legal Principles**

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different

> grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at

> 75 ("The gloss of clear error fails to give proper
> deference to state courts by conflating error (even clear
> error) with unreasonableness."); <u>Williams v. Taylor</u>,
> 529 U.S. 362, 410 (2000) ("[A]n unreasonable
> application of federal law is different from an incorrect
> application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal

citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254

habeas action in federal court, a petitioner must exhaust all state court

remedies that are available for challenging his state conviction. <u>See</u> 28 U.S.C.

§ 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]"

every issue raised in his federal petition to the state's highest court, either on

direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351

(1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners

must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28

> U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[2] supra, at 747–748, 111 S. Ct. 2546; Sykes,[3] supra, at 84–85, 97 S. Ct.

---

[2] Coleman v. Thompson, 501 U.S. 722 (1991).

[3] Wainwright v. Sykes, 433 U.S. 72 (1977).

2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

---

[4] Murray v. Carrier, 477 U.S. 478 (1986).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases,

allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Appellate Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016).

When considering deficient performance by appellate counsel,

> a court must presume counsel's performance was "within the wide range of reasonable professional assistance." <u>Id.</u> at 689, 104 S. Ct. 2052. Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit

> meritorious) arguments.  See Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009).  "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith v. Robbins, 528 U.S. 259, 288 (2000) (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1986)); see also Burger v. Kemp, 483 U.S. 776, 784 (1987) (finding no ineffective assistance of counsel when the failure to raise a particular issue had "a sound strategic basis").

Id.; see also Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009) ("failing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004); see also Philmore, 575 F.3d at 1264-65 (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal").  Also,

> [a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. 2052.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. As such, "[a]ppellate counsel might fail to identify a mediocre or obscure basis for reversal without being ineffective under Strickland." Overstreet, 811 F.3d at 1287 (citation omitted).

For both claims of ineffective assistance of trial counsel and appellate counsel, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163.  Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105.  As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

"Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.   <u>Petitioner's Claims and Analysis</u>

### A. Ground One

Petitioner argues that during trial, the prosecutor violated his Fifth and Fourteenth Amendment rights by commenting and questioning Petitioner and state witnesses regarding Petitioner's post-arrest, post-<u>Miranda</u>[5] silence during his police interrogation. Doc. 1 at 6-10, 15. He argues the prosecutor improperly used Petitioner's silence as impeachment evidence and referred to his silence during closing arguments. He also avers "[t]he cumulative effect of the prosecutorial comments amounted to fundamental error." <u>Id.</u> at 10.

In his Florida Rule of Criminal Procedure 3.850 motion for postconviction relief, Petitioner raised claims of prosecutorial misconduct challenging these

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

statements and arguments. Resp. Ex. D1 at 11-19, 183. The trial court summarily denied the claims, finding in pertinent part:

> In the instant Motions, Defendant alleges: (1) the prosecutor made improper comments on Defendant's right to remain silent through impeachment, testimony of State's witnesses, and closing argument; and (2) the cumulative effect of the prosecutorial comments amounted to fundamental error. The Court finds these allegations procedurally barred. Everett v. State, 54 So. 3d 464, 488 (Fla. 2010) (citing Miller v. State, 926 So. 2d 1243, 1260 (Fla. 2006) ("[A] claim that could and should have been raised on direct appeal is procedurally barred.")). Notably, Defendant challenged many prosecutorial comments on direct appeal.[6] The First District Court of Appeal found those allegations meritless. Even assuming arguendo that the claims were not procedurally barred, upon a review of the trial transcripts, the court finds Defendant is not entitled to relief.

Resp. Ex. D1 at 245-46 (record citations and footnote omitted). The First District Court of Appeal per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. D5.

Respondents argue this claim is procedurally barred because the state court declined to consider it based on an independent and adequate state procedural ground. Resp. at 7-10, 14-17. A procedural default may result from non-compliance with state procedural requirements. See Coleman, 501 U.S. at 729-30. And "[t]here is no doubt that, under Florida law, a claim is procedurally

---

[6] In Ground Three infra, the Court discusses the prosecutorial misconduct claims Petitioner raised during his direct appeal.

barred from being raised on collateral review if it could have been, but was not raised on direct appeal." Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179 (11th Cir. 2010). The procedurally correct way to raise a claim of prosecutorial misconduct in state court is by direct appeal, and the procedural bar imposed in Petitioner's case is firmly established and regularly followed in the Florida courts. See Fla. R. Crim. P. 3.850(7); Dailey v. State, 965 So.2d 38, 44 n.5 (Fla. 2007) (holding that defendant's claim that prosecutor improperly commented on defendant's right to remain silent could have and should have been raised on direct appeal and was thus procedurally barred on collateral review).

Petitioner appears to recognize this claim is unexhausted but argues he has demonstrated cause for and prejudice from this default because the state court should have reviewed the merits of this claim regardless of the procedural posture in which the comments were challenged. Doc. 1 at 10. However, all of the prosecutorial comments and arguments he challenges were known at the time Petitioner filed his direct appeal, and he fails to argue that some objective factor, which cannot be fairly attributable to his own conduct, prevented him from raising this claim. Further, to the extent Petitioner asserts a "fundamental miscarriage of justice" exception to the procedural bar, he has failed to allege actual innocence. As such, this Court finds the claim is procedurally defaulted. See Coleman, 501 U.S. at 729-30. In any event, as described in the Court's

analysis of Ground Two, Petitioner's challenges to the prosecutor's comments on his post-<u>Miranda</u> silence are without merit. Ground One is due to be denied.

### B. Ground Two

Petitioner argues his appellate counsel was ineffective for failing to challenge on direct appeal the prosecutor's misstatement of the law that Petitioner committed a burglary simply by entering the house. Doc. 1 at 12. He also avers his appellate counsel was ineffective for failing to challenge: (1) the prosecutor's improper questioning of the state detective regarding Petitioner's post-<u>Miranda</u> silence; (2) the prosecutor's use of Petitioner's silence as impeachment evidence during Petitioner's trial testimony; and (3) the prosecutor's comments during closing regarding Petitioner's right to remain silent. <u>Id.</u>

Following his direct appeal, Petitioner raised these claims of ineffective assistance of appellate counsel in a petition filed with the First DCA. Resp. Ex. C1. The First DCA issued a brief one-line order denying the petition "on the merits." Resp. Ex. C2. The First DCA's adjudication of these allegations is entitled to AEDPA deference. For context, the Court summarizes the evidence produced at trial and the comments Petitioner now challenges.

### i. Evidence at Trial

Elizabeth Stills, the victim's neighbor and friend, testified that on the day of the burglary, she noticed an unfamiliar gray vehicle in the victim's driveway

while the victim was at work. Resp. Ex. B2 at 152-54. Stills proceeded to call the victim at work to notify her of the car, and then Stills called the police. <u>Id.</u> at 155. Stills testified she saw a man going into the victim's side door with a tool, so she walked out onto her porch about 10 to 15 feet from the victim's side door to get a better view of the man. <u>Id.</u> at 156. She explained the man was slender, brown-skinned, wearing a black shirt, khakis, and had dreadlock/braids. <u>Id.</u> at 156-57. Stills stated she then saw the man walk out of the victim's home carrying a comforter or blanket that "[l]ooked like it had stuff in it." <u>Id.</u> at 157. Stills asserted that she yelled at the man and asked what he was doing, but she was not sure if he responded. <u>Id.</u> at 158. She stated the man then threw the blanket in the passenger side of his vehicle and left. <u>Id.</u> at 158. Stills testified that the man was alone and that she only saw one person break into the victim's home. <u>Id.</u>

The victim, Jacqueline Lee, testified she did not give anyone permission to be at her house on the day of the burglary. <u>Id.</u> at 183. She explained that when she returned home that day, she noticed her carport door had been kicked in, blood was on her armoire, and her belongings were in disarray. <u>Id.</u> at 186. She then conducted a walkthrough of her home with police and noticed her computer was missing and her comforter, sheets, and pillows were gone. <u>Id.</u> at 188. She testified her mattress looked disheveled and then realized the firearm she stored under her mattress was also missing. <u>Id.</u> at 188-89.

Thomas Howell, a latent print examiner, testified Petitioner's fingerprints matched the prints obtained from the victim's kitchen storm door. Id. at 179. Further, Detective S. Wells testified that the blood discovered and collected from the victim's armoire was fresh. Id. at 214-15. And Larry Denton testified the STR-DNA from the blood collected from the armoire matched Petitioner's DNA profile at every marker. Id. at 227-28. Detective Kevin Porter testified that after the initial police report, he was assigned to the case. Id. at 165. He explained that he ultimately arrested Petitioner for the offense and when Petitioner was arrested, he was driving a gray/silver Chrysler. Id.

Petitioner then testified on his own behalf. Id. at 236. He explained that on the day of the burglary, he was driving with "a close friend" or "relative" named A.P. Id. at 237-39, 245. Petitioner explained that A.P. wanted to go to "some guy's" home because she had a conflict with the guy. Id. at 237-39. He testified she drove to what Petitioner believed to be the guy's house and she got out of the car and kicked in the side door of the house and came out with a brick. Id. at 239-40. Petitioner stated he then went inside the home and got into a conflict with A.P. regarding whose home they were in. Id. He claimed she then hit him, and he started to bleed. Id. at 241. Petitioner asserted he then left the house and got back into the passenger seat of the car, and A.P. then exited the home and got into the driver's seat before driving away. Id. at 242. According to Petitioner, she did not have anything in her hands when she left the home. Id.

16

He stated that she then took him home, but she went back to the house with other people to burglarize it. Id. at 243.

During the state's cross-examination of Petitioner, the following exchange occurred:

> Q:    You had no permission to ever be inside [Jacqueline Lee's] home?
>
> A:    I admit I went inside her home, but I did not burglarize her home.
>
> . . .
>
> Q:    You unlawfully without permission went inside Ms. Jacqueline Lee's home?
>
> A:    I unlawfully went inside her home, I admit it.
>
> . . .
>
> Q:    Mr. Nelson, let me just tell you this: That burglary occurred the moment you admitted from that stand that you unlawfully entered that home. Do you understand that?
>
> A:    I unlawfully entered into the home, but I didn't (talking over) --
>
> Q:    Exactly. Do you understand that the State -- the law in the State of Florida is that that in and of itself is a burglary? Do you understand that?
>
> A:    I don't know entering (inaudible) --
>
> Q:    Objection, Your Honor.
>
> The Court:  I will sustain the defense's objection.

Resp. Ex. B3 at 247-48, 258. Petitioner also testified he remembered meeting with Detective Porter following his arrest. Id. at 255. Petitioner stated that he told Detective Porter he had "nothing to do with the burglary crime." Id. The following exchange then occurred:

> Q:    Mr. Nelson, again, did you tell Detective Porter you had never been in the home of [Jacqueline Lee]?
>
> A:    He's the detective. I don't tell nobody the truth but what I'm saying right now.
>
> Q:    I'm sorry?
>
> A:    I'm saying, I didn't tell nobody the truth about what happened but my attorney until now when I'm on up here on the stand.
>
> Q:    Mr. Nelson, yes or no?
>
> A:    No.
>
> Q:    You did not tell Detective Porter that?
>
> A:    No, I did not tell him that.
>
> . . .
>
> Q:    If you were so mad at [A.P.] to where you were throwing punches at her to get her to stop, why didn't you tell police, [h]ey my relative just broke into this house?
>
> A:    All right, it going to get deep. I ain't (unintelligible) another person. I got -- you know what I'm saying. I was locked up because of -- I got locked up, you know what I'm saying, I ain't talk to her since I've been incarcerated, you know what I'm saying, I mean --

18

. . .

> Q:    [L]et me ask you this: right after it happened why
> not tell the police, Hey [my friend] just broke into this
> house? Why not tell --
>
> A:    She --
>
> Q:    -- Detective Porter when you're interviewed by
> him, A.P. broke into the house?
>
> A:    I didn't witness no burglary with her. I didn't
> witness her taking nothing. Nobody was at home . . . .

Id. at 247-48, 255-57.

Following Petitioner's testimony, the state recalled Detective Porter as a

rebuttal witness. Id. at 264. He testified he interviewed Petitioner following his

arrest and read Petitioner his constitutional rights. Id. at 269. According to

Detective Porter, after he advised Petitioner of his rights, Petitioner agreed to

speak with him. Id. at 270. Detective Porter then testified to the following:

> Q:    At any point in time did Mr. Nelson indicate to
> you that there was another individual with him the
> date of the burglary?
>
> A:    No, ma'am.
>
> Q:    At any point in time did he mention to you
> somebody by the name of A.P.?
>
> A:    No, ma'am.
>
> Q:    At any point in time did he mention to you a
> sister-in-law that may have been with him?
>
> A:    No, ma'am.

. . .

Q:    Did you ask him about the burglary that happened at Ms. Jacqueline Lee's home?

A:    Yes, I did.

Q:    What did he tell you about it?

A:    I told him about what was found at the house, and he denied it. And he said he doesn't know how his prints or anything could have been in that house.

Q:    Did he ever tell you that he had gone into that house?

A:    No.

Q:    Did he deny ever being in that house?

A:    Yes.

Q:    So at no point in time [sic] he ever told you, I went inside that home with my sister-in-law?

A:    No time he told me that.

Resp. Ex. B3 at 269-71. During closing arguments, the prosecutor made the following statements:

I think that we can all agree that the defendant, by his own admission admitted to the crime of a burglary. He admitted to being inside the home, the stealthy entry when he threw the brick. I think we can admit that we have a burglary.

. . .

The defendant never told Detective Porter when he was arrested, Oh, hey, I was with my sister-in-law, A.P.,

20

> she's the one that entered that home. I didn't enter that
> home with the intent to do anything wrong. He never
> mentions that. The first time he said that is today in
> court after hearing all of the State's evidence against
> him.

Resp. Ex. B4 at 341. The jury found Petitioner guilty of unarmed burglary, a
lesser included offense, and the trial court sentenced Petitioner as an HFO to a
twenty-five-year term of incarceration with a fifteen-year minimum mandatory
as a PRR. Resp. Ex. B1 at 107-19. Petitioner, with the help of appellate counsel,
sought a direct appeal, and the First DCA per curiam affirmed his judgment
and sentence without a written opinion. Resp. Ex. B7.

### ii. Analysis

The Court gives considerable deference to appellate counsel's strategic
decision of selecting the issue or issues to raise on appeal.  The danger of raising
weaker issues in a "kitchen-sink" approach is that it detracts from the attention
an appellate court can devote to the stronger issues and reduces appellate
counsel's credibility before the court.  See Miller v. Keeney, 882 F.2d 1428, 1434
(9th Cir. 1989); see also McBride v. Sharpe, 25 F.3d 962, 973 (11th Cir. 1994).
Thus, effective appellate attorneys "will weed out weaker arguments, even
though they may have merit."  Philmore, 575 F.3d at 1264; see also Overstreet,
811 F.3d at 1287. Appellate counsel's failure to raise a meritless or weaker issue
does not constitute deficient performance which falls measurably outside the
range of constitutionally acceptable performance.  See Brown v. United States,

720 F.3d 1316, 1335 (11th Cir. 2013) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); Owen, 568 F.3d at 915. Prejudice results only if "the neglected claim would have a reasonable probability of success on appeal." Philmore, 575 F.3d at 1264-65.

Petitioner argues that the prosecutor's comments regarding Petitioner's failure to tell Detective Porter the version of events that Petitioner testified to at trial was an improper remark on his right to remain silent; and thus, appellate counsel should have challenged those comments on appeal. "It is well established that a prosecutor cannot comment on a defendant's post-Miranda silence to impeach exculpatory testimony on the ground that the defendant did not explain his conduct at the time of his arrest." United States v. Dodd, 111 F.3d 867, 869 (11th Cir. 1997); see also Doyle v. Ohio, 426 U.S. 610 (1976). "A comment is deemed to be a reference to a defendant's silence if it was the prosecutor's manifest intention to refer to the defendant's silence or if it was of such a character that the jury would naturally and necessarily understand it to be a comment on a defendant's silence." Dodd, 111 F.3d at 869. Here, however, it is not clear that Dodd is applicable to Petitioner's case. After receiving his Miranda warnings, instead of remaining silent, Petitioner voluntarily agreed to speak with Detective Porter; and the prosecutor's comments focused on contradictions between that conversation and Petitioner's trial testimony.

Further, the version to which Petitioner testified to at trial was not entirely exculpatory.

Nevertheless, even if the prosecutor's comments were an objectionable reference to Petitioner's "silence," the weight of the evidence demonstrating Petitioner committed the offense defeats a finding of prejudice. See, e.g., Smith v. Crosby, 159 F. App'x 76, 80 (11th Cir. 2005) (concluding that the petitioner failed to demonstrate prejudice in relation to his claim that counsel was ineffective for failing to object to prosecutor's statements regarding the petitioner's silence given the weight of the evidence); see also Fugate v. Head, 261 F.3d 1203, 1224 (11th Cir. 2001) (concluding that the petitioner failed to establish prejudice pursuant to Strickland on claim that counsel failed to object to prosecutorial comments that implicated the petitioner's right to remain silent).

Petitioner admitted to entering Lee's home without her permission, and Stills testified that she saw a male break in through Lee's side door to enter the home and then exit with a large blanket full of stuff. As such, assuming the state never questioned Petitioner regarding his failure to inform Detective Porter of his version of events nor referenced such during closing, the weight of evidence supports the jury's finding that Petitioner unlawfully entered Lee's home stealthily and with intent to commit a theft. As such, the Court concludes that the state court's adjudication of this claim was not contrary to, nor did it

involve an unreasonable application of <u>Strickland</u>, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As to Petitioner's claim that appellate counsel should have argued on direct appeal that the prosecutor misstated the law by stating Petitioner committed a burglary just by entering Lee's home, the Court also finds such argument would have been meritless. Section 810.07(1), Florida Statutes, provides "that where a defendant is tried on a burglary charge, evidence that the defendant entered a particular structure or conveyance 'stealthily and without consent of the owner or occupant thereof is <u>prima facie</u> evidence of entering with intent to commit an offense.'" <u>Lanzo v. State</u>, 73 So.3d 817, 819 (Fla. 5th DCA 2011) (quoting § 810.07(1), Fla. Stat.). "Stealth" has been "interpreted to mean activity that is 'surreptitious, furtive, or sly.'" <u>Id.</u>

Here, the trial court instructed the jury on the statutory presumption in § 810.07(1), Resp. Ex. B1 at 48, and the state presented evidence that Petitioner entered Lee's home without permission and that he did so by breaking into her side carport door while Lee was at work. As such, the prosecutor's statements were not a misstatement of the law, and even if they were, Petitioner cannot demonstrate prejudice. Notably, he cannot demonstrate that but for appellate counsel's failure to challenge these comments, the outcome of his appeal would have been different. The Court concludes that the state court's adjudication of

this claim was not contrary to, nor did it involve an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Two is due to be denied.

### C. Ground Three

Petitioner raises two sub-claims. First, he argues the trial court abused its discretion when it denied his request for an alternative jury instruction on burglary. Doc. 1 at 13. Next, Petitioner argues he was denied a fair trial when the state, during its cross-examination of Petitioner and its closing argument, suggested Petitioner was not credible because he was present for the other witnesses' trial testimony. Id.

Petitioner, with the help of appellate counsel, raised both of these claims during his direct appeal. Resp. Ex. B5. The state filed an answer brief addressing the claims on the merits, Resp. Ex. B6, and the First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion, Resp. Ex. B7.

Respondents contend that Petitioner's allegations are unexhausted because they were raised only as an issue of state law in state court. Resp. at 11. Respondents also aver these claims are without merit. Id. For purposes of this Order, the Court assumes these claims are exhausted and otherwise

cognizable on federal habeas review. Nevertheless, they are without merit because the state court's adjudication of these claims is entitled to deference.

### i. Request for Alternative Jury Instruction for Burglary

As to Petitioner's first sub-claim regarding the trial court's denial of his request for an alternative burglary jury instruction, Petitioner must show that the state trial court's failure to read the instruction so infected the entire trial that his resulting conviction for burglary violated due process. Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The Court does not judge the allegedly erroneous instruction "in artificial isolation," but considers the instruction in the context of the trial record and the jury instructions as a whole. Id. at 152 n. 10 (citing Boyd v. United States, 271 U.S. 104, 107 (1926)). Further, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 154. Accordingly, where, as here, the alleged error is an omitted instruction, the burden on the petitioner is "especially heavy." Id.

During the charge conference, Petitioner proposed two amendments to the jury instructions on burglary. He wanted the amendments to be considered in the alternative, meaning if the court rejected the first proposed amendment, then he wanted the trial court to consider the second proposed amendment. Resp. Ex. B3 at 295-96. The first proposed amendment added the following language, outlined in bold:

As to Count I, to prove the crime of Burglary, the State must prove the following elements beyond all reasonable doubt:

3. CHARLES TONY NELSON entered a structure owned by or in the possession of Jacqueline Lee.

4. At the time of entering the structure, CHARLES TONY NELSON had the intent to commit an offense in that structure, **other than the crime of trespass**.

You may infer that CHARLES TONY NELSON had the intent to commit a crime inside the structure, if the entering or attempted entering of the structure was done stealthily and without the consent of the owner or occupant.

Resp. Ex. B1 at 68. The second proposed amendment sought to add the following language, outlined in bold:

As to Count I, to prove the crime of Burglary, the State must prove the following elements beyond all reasonable doubt:

3. CHARLES TONY NELSON entered a structure owned by or in the possession of Jacqueline Lee.

4. At the time of entering the structure, CHARLES TONY NELSON had the intent to commit an offense in that structure.

You may infer that CHARLES TONY NELSON had the intent to commit a crime inside the structure, if the entering or attempted entering of the structure was done stealthily and without the consent of the owner or occupant.

The entry necessary need not be the whole body of the defendant. It is sufficient if the defendant extends any part of the body far enough into the structure to commit an offense therein.

The intent with which an act is done is an operation of the mind and, therefore, is not always capable of direct and positive proof. It may be established by circumstantial evidence like any other fact in a case.

Even though an unlawful entering or remaining in a structure is proved, if the evidence does not establish that it was done with the intent to commit an offense therein, the defendant must be found not guilty of burglary. **In other words, it must be proved that an offense beyond trespassing was intended to be committed inside the structure.**

Id. at 69. The state objected to these proposed instructions. Resp. Ex. B3 at 296. It argued that it was not necessary to modify the standard jury instructions because it was obvious that a trespass could not be the offense committed within the dwelling because it was the first element of the burglary charge. Id. The state also asserted trespass would be a necessarily lesser included offense and using these modified instructions would cause confusion in light of the portion of the burglary instructions that dealt with stealthy entry. Id. at 296-97. It then argued Petitioner could make his trespass argument during closing. Id. The trial court denied Petitioner's request as follows:

And I do want to put on the record the reasoning of the Court. The Court's reasoning is that the trespass instruction is going to be read, so that the jury will be

> informed of what trespass is and that it is a lesser
> included. I'm sorry, I just wanted to put it on the record.

Id. at 304. Thereafter, during closing argument, defense counsel argued the state only proved Petitioner committed a trespass. Resp. Ex. B4 at 339-40.

When viewed in the context of the trial as a whole, Petitioner has not met his heavy burden of showing that the trial court's failure to read a special instruction for burglary violated due process. The state court's adjudication was neither contrary to, nor based upon an unreasonable application of Henderson or any other clearly established federal law. This argument is due to be denied.

### ii. Tailoring of Petitioner's Trial Testimony

As to Petitioner's second sub-claim, Petitioner argued on direct appeal that the prosecutor's cross-examination of Petitioner regarding his ability to tailor his trial testimony to best suit his defense after he heard all of the testimony and saw all of the evidence presented during trial violated his constitutional right to be present at trial. Resp. Ex. B3 at 244, 256. He also challenged the state's closing argument that Petitioner was the only witness who had the opportunity to listen to all of the evidence presented at trial before testifying. Resp. Ex. B4 at 341.

Relying on Portuondo v. Agard, 529 U.S. 61 (2000), the state argued in its answer brief that "a prosecutor's comment on the defendant's ability to listen to the testimony of other witnesses and tailor his testimony to conform with those

witnesses constitutes a proper attack on the defendant's credibility." Resp. Ex. B6. The Court agrees.

Once a defendant takes the stand, his credibility is at issue, and he may be impeached and his testimony assailed like any other witness. <u>Agard</u>, 529 U.S. at 69. A prosecutor's comments or questions calling the jury's attention to the fact that a defendant had the opportunity to hear other witnesses testify and to tailor his testimony, does not unlawfully burden a defendant's right to be present at trial, to be confronted with witnesses, or to testify on his own behalf, nor does it violate his right to due process. <u>Id.</u> Upon review of the record, the Court finds that the state court's adjudication of this issue was neither contrary to, nor based upon an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Ground Three is due to be denied.

### D. Ground Four

Petitioner again challenges the prosecutor's cross-examination of Petitioner and closing arguments regarding Petitioner's post-arrest, post-<u>Miranda</u> silence, alleging such comments amounted to a "fundamental miscarriage of justice." Doc. 1 at 15-21. In his Reply, Petitioner provides that this claim is "essentially the same [claim] raised in [G]round [O]ne." Reply at 28. The Court previously addressed this argument and denies this claim for the

same reasons detailed in Grounds One and Two of this Order. As such, Ground Four is due to be denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability.   Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

---

[7] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).  Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of September, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:    Charles Nelson, #J20818
      Michael Brent McDermott, Esq.